**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGORY HAYNES, (R04965),

      Petitioner,

v.

TYRONE BAKER,[1]

      Respondent.

Case No. 23 C 15338

Hon. LaShonda A. Hunt

**MEMORANDUM OPINION AND ORDER**

Petitioner Gregory Haynes, a state prisoner convicted of first-degree murder, brings this *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging his trial and appellate counsel were ineffective. (Dkt. 1). For the reasons discussed below, the petition is denied, and the Court declines to issue a certificate of appealability.

**BACKGROUND**

The relevant facts are drawn from the state court record (Dkt. 28) and the state appellate court opinions (Dkts. 28-1; 28-2) and are presumed to be correct. 28 U.S.C. § 2254(e)(1). On March 8, 2008, Petitioner was at a party playing cards in a bedroom with Terrell Thomas and a few other guests. *People v. Haynes*, 2017 IL App (1st) 150590-U, ¶ 3 (Dkt. 28-1).[2] Approximately 40 to 50 other people were present at the party. Dkt. 28-2 at ¶ 6. While playing cards, Petitioner pulled out a gun and shot and killed Thomas. *Id.*

---

[1] Petitioner is currently incarcerated at Danville Correctional Center, where the warden is McKenna Wenzel. The Clerk is directed, forthwith, to substitute Tyrone Baker for McKenna Wenzel as the Respondent in this case pursuant to Fed. R. Civ. P. 25(d).

[2] For brevity, the Court refers to *People v. Haynes*, 2017 IL App (1st) 150590-U (Dkt. 28-1) as "Dkt. 28-1" and *People v. Haynes*, 2021 IL App (1st) 200110-U (Dkt. 28-2) as "Dkt. 28-2."

### A.    <u>Trial Court Proceedings</u>

#### a.  <u>Eyewitness Testimony</u>

The prosecution presented testimony from four eyewitnesses, each of whom was in the room at the time of the shooting. Dkt. 28-2 at ¶ 6. The first eyewitness, Krystal Kennedy, testified that she had known Petitioner since eighth or ninth grade. Dkt. 28-1 at ¶ 3. Kennedy also testified that roughly five or six months before the shooting, Petitioner told Kennedy he did not like Thomas and that Thomas had been involved in killing Petitioner's cousin. *Id.* at ¶ 3. While Kennedy told Thomas about this conversation, she did not tell Petitioner she talked to Thomas about it. *Id.* Kennedy also told this to Jason Greenfield, who was Thomas's friend and the father of Kennedy's child. Dkt. 28-2 at ¶ 7.

According to Kennedy, Petitioner was "real drunk" at the party. *Id.* At some point, Thomas arrived at the party with his friends—Greenfield, Marshall Stewart, and Michael Baker. *Id.* Kennedy, Thomas, Petitioner, and another eyewitness, Brandi Thompson, sat down at a table in a bedroom to play cards. *Id.* Kennedy said Stewart and Baker stood behind Petitioner at the table. *Id.* Kennedy testified that, during the card game, Petitioner pulled out a gun and shouted "F--- this" (or something to that effect) and fired the gun at Thomas, but Kennedy did not know whether Petitioner shouted or fired his weapon first. Dkt. 28-1 at ¶ 4; Dkt. 28-2 at ¶ 7. She also could not recall whether Petitioner was standing or sitting when he opened fire, but he continued to squeeze the trigger after the clip was empty. Dkt. 28-2 at ¶ 7. Stewart and Baker ran out of the room, followed by Petitioner. *Id.* Kennedy stated that Thomas raised his arms in front of his face during the shooting and that he had cards in his hands and did not have a gun. *Id.* In her testimony, Kennedy denied that any argument preceded the shooting. *Id.*

Thompson had first met Petitioner on the night of the shooting. Dkt. 28-1 at ¶ 5. Thompson was part of the card game and, while playing, she sat across from Kennedy and Petitioner sat across from Thomas. *Id.*; Dkt. 28-2 at ¶ 8. Only six people were in the bedroom. Dkt. 28-2 at ¶ 8. Petitioner made a comment to Thomas about beating Kennedy and Thompson and, according to Thompson, Petitioner was "in a good mood and making jokes" and no one was arguing. Dkt. 28-2 at ¶ 8. But Thompson said that after playing a few rounds, Petitioner pulled out a gun from under the table and shot Thomas seven or eight times. *Id.*; Dkt. 28-1 at ¶ 5. According to Thompson, the first bullet struck Thomas's "outstretched" hand as he "raised it in front of his body," and the remaining bullets "went straight to his chest." *Id.* Thompson said Petitioner "continued to pull the trigger on his gun until it emptied" and there was no weapon near Thomas. Dkt. 28-1 at ¶ 5. Petitioner ran to the back door but when it was locked, he ran out the front door. *Id.* Thompson also said that Thomas's friends ran out of the room when Petitioner pulled the gun and never returned. Dkt. 28-2 at ¶ 8.

Stewart testified that when he arrived at the party, Petitioner was throwing up and said that he had been taking ecstasy. Dkt. 28-2 at ¶ 9. According to Stewart, he sat behind Kennedy as the card game began and did not see what Thomas was doing right before Petitioner opened fire because he had bent down to pick up a drink. Dkt. 28-1 at ¶ 6; Dkt. 28-2 at ¶ 9. Stewart heard Petitioner say "I'm sick of this s--- bro. This s--- is killing me" and then heard five shots. Dkt. 28-2 at ¶ 9. Stewart testified that there were no words or confrontation by Thomas before the shooting, no one threatened Petitioner, and he did not see Thomas with a weapon. *Id.* Stewart's testimony was that after the shooting, he ran out of the room and later returned to find someone administering CPR to Thomas. *Id.* At that time, he did not see any weapon near Thomas. *Id.*

Finally, Baker testified that upon arriving to the party, Petitioner was throwing up. *Id.* at ¶ 10. According to Baker, neither he nor Stewart ever stood behind Petitioner during the card game. *Id.* Baker testified that he saw Petitioner "just lean back and take out the gun and start shooting [Thomas] in the chest[.]" Dkt. 28-1 at ¶ 7. Baker said Thomas raised his hands and said "no, no" when Petitioner began shooting, and Thomas did not have a weapon in his hands. *Id.* Finally, Baker testified that he did not hear Thomas and Petitioner argue or make any threats before Petitioner opened fire. *Id.*; Dkt. 28-2 at ¶ 10. According to Baker, he and Stewart ran out of the house after the shooting and never returned to the bedroom. Dkt. 28-2 at ¶ 10.

### b. Defense Witness Testimony

Petitioner testified on his own behalf at his trial. Dkt. 28-1 at ¶ 9. According to Petitioner, he did not know Stewart, Baker, and Thomas, with whom he had had problems since grade school, would be at the party. *Id.* Petitioner said he initially joked with Thomas about beating Kennedy and Thompson at cards and, as Thompson began dealing the cards, Stewart and Baker came up and stood behind Petitioner while Petitioner was seated. Dkt. 28-1 at ¶ 10; Dkt. 28-2 at ¶ 12. According to Petitioner, Stewart was "really close to him." Dkt. 28-2 at ¶ 12. Stewart said something to Petitioner that he did not hear. Dkt. 28-1 at ¶ 10. When Petitioner looked at Stewart, Stewart had a "threatening" facial expression. *Id.*

When Petitioner was asked if, at that point, Thomas reached for a gun, Petitioner testified "no" and that he reached for his gun first. *Id.* at ¶ 11. Petitioner continued that he "jumped up," grabbed his gun, said "what the f---" and, at that point, Thomas came out of his seat and pulled out a gun which prompted Petitioner to shoot to "protect himself." *Id.* at ¶¶ 11-12. According to Petitioner, his first shot hit Thomas in the chest, but he did not know where the other shots landed. *Id.* at ¶ 11. Petitioner admitted that he did not know if Thomas or others had a gun and

4

acknowledged on cross-examination that Thomas did not threaten nor speak to him before Petitioner shot him. *Id.* at ¶ 12.

The trial court permitted testimony regarding Thomas's violent character. *Id.* at ¶ 13. In response, Petitioner testified:

- Petitioner's cousin, Alexis Crenshaw, told Petitioner that in 2000, she was with Thomas at a park (Crenshaw and Thomas were dating then) when he pulled out a gun and said he wanted to "pop somebody[;]"

- in 2001, Petitioner talked to someone who said Thomas had shot him in the stomach;

- in 2004, Crenshaw told Petitioner that Thomas had killed her boyfriend while he and Crenshaw were sitting in a car; and

- in 2006, Thomas shot at Petitioner while Petitioner was in a car after dropping his child off at a relative's house, but Petitioner did not report the incident to police as he did not think anything could be done given that the bullet hit the back window of his car rather than him.

*Id.* at ¶¶ 9, 13-15.

Crenshaw also testified on Petitioner's behalf. *Id.* at ¶ 9. According to Crenshaw, she reported the shooting of her boyfriend but did not implicate Thomas out of fear of retribution. *Id.* at ¶ 15.

### c.  Expert Testimony

Following the shooting, Dr. John Ralston performed a post-mortem examination on Thomas. *Id.* at ¶ 8. According to Dr. Ralston, Thomas had seven gunshot wounds to his chest and four gunshot wounds to his arms and hands. *Id.* Dr. Ralson was offered as an expert in the field of

5

forensic pathology and the parties stipulated to the admission of his testimony that Thomas died of multiple gunshot wounds to the chest, abdomen, arms, and hands. *Id.*; Dkt. 28-2 at ¶ 11. The parties also stipulated to the fact that eight 9-millimeter expended cartridge cases and three fired bullets were recovered at the scene, all of which were fired from the same gun. Dkt. 28-2 at ¶ 11.

### d. **Disposition**

Following a bench trial, Petitioner was convicted of one count of first-degree murder. Dkt. 28-1 at ¶¶ 2, 23, 44; Dkt. 28-2 at ¶¶ 2, 14. The trial court specifically stated it "was not persuaded that the defense of self-defense [was] applicable in this case" and while Petitioner "may have been afraid" of Thomas, he could have left the card game. Dkt. 28-1 at ¶ 23. Additionally, the court found Petitioner "was the initial aggressor and there was no imminent danger of harm." Dkt. 28-2 at ¶ 14. Petitioner was sentenced to 55 years in prison. Dkt. 28-1 at ¶ 2; Dkt. 28-2 at ¶ 2.

Petitioner filed a posttrial motion in which he claimed that he met the elements of self-defense by a preponderance of the evidence and, therefore, the trial court erred when it convicted him of first rather than second-degree murder. *Id.* at ¶ 25. The court denied Petitioner's motion, finding Petitioner was the initial aggressor and that the testimony of the State's witnesses did not corroborate Petitioner's account of the events. *Id.* at ¶ 41.

### B. **Direct Appeal**

Petitioner appealed, arguing, in pertinent part, that the trial court conflated the legal standards for self-defense and second-degree murder and thus held Petitioner to a higher burden of proof than was required under law. *Id.* at ¶¶ 2, 43, 51. Petitioner did not raise any arguments on appeal that his trial counsel was ineffective. *See generally People v. Haynes*, 2017 IL App (1st) 150590-U (Dkt. 28-1). The appellate court affirmed Petitioner's conviction. *Id.* at ¶¶ 70-71.

Petitioner filed a petition for a rehearing, which was denied. (State Ct. R., Ex. 8 at 895; Dkt. 28-9; State Ct. R., Ex. 9; Dkt. 28-10).

Petitioner filed a counseled Petition for Leave to Appeal (PLA) in which he argued the Court should grant leave to appeal to determine whether "a criminal defendant arguing for a reduction to second-degree murder [has] to show by a preponderance of the evidence that the first five factors of self-defense are present" and, more specifically, "whether, to warrant a reduction to second-degree murder, a defendant must objectively show the presence of the first five factors of self-defense or must subjectively show that he believed that the factors were present." (State Ct. R., Ex. 8 at 858, 867-71; Dkt. 28-9). The Supreme Court of Illinois denied Petitioner's PLA. (*Id.* at 897-98). Subsequently, the United States Supreme Court denied Petitioner's petition for writ of certiorari. (State Ct. R., Ex. 10; Dkt. 28-11).

### C.   <u>Post-Conviction Proceedings</u>

Petitioner filed a counseled petition for postconviction relief, contending that his trial counsel was ineffective for, in pertinent part: (1) permitting "faulty forensic evidence to be admitted into evidence . . . by failing to check the stipulation for accuracy;" (2) failing to "investigate the forensic evidence" by, among other things, "failing to interview the forensic pathologist;" (3) stipulating to Dr. Ralston's testimony without first consulting Petitioner; and (4) failing to bring to the fact finder's attention "that the physical evidence contradicted the testimony of the eyewitnesses who all claimed the decedent was unarmed." (State Ct. R., Ex. 3 at 227; Dkt. 28-3). Petitioner also claimed his appellate counsel was ineffective for "failure to raise these issues" on direct appeal. (*Id.*). In support of his petition, Petitioner attached four redacted handwritten statements to the police (with the names of those making the reports also redacted); a redacted Chicago Police Department (CPD) case supplementary report; a diagram of the victim's

injuries; and a redacted CPD general offense case report. *People v. Haynes*, 2021 IL App (1st) 200110-U at ¶ 20 (Dkt. 28-2). The trial court dismissed the petition at the first stage, finding that "Petitioner's claims simply [were] not legally sufficient under the Act" and his allegations of ineffective assistance were "entirely conclusory," thus rendering Petitioner's claims "frivolous and patently without merit." (State Ct. R., Ex. 3 at 290-99; Dkt. 28-3).

Petitioner filed a counseled appeal, arguing the circuit court: (1) conflated the standards for first and second stage proceedings resulting in the court imposing a greater burden of proof on Petitioner; (2) impermissibly imposed a requirement on Petitioner of producing affidavits to support the facts alleged in the petition; (3) impermissibly resolved disputed factual issues in favor of the State; and (4) inappropriately determined that trial and appellate counsel made strategic decisions. (State Ct. R., Ex. 11 at Dkt. 28-12). The appellate court, after *de novo* review, affirmed the trial court's dismissal. *People v. Haynes*, 2021 IL App (1st) 200110-U, at ¶¶ 2, 62-63 (Dkt. 28-2).

Next, Petitioner filed a *pro se* motion for leave to file a late PLA and a *pro se* PLA seeking review of the appellate court decision that he did not present the "gist" of a constitutional claim when he, among other things, stated that counsel was ineffective in allowing the admission of faulty forensic evidence and failing to "expose the fact that the eyewitness' accounts [did] not match up with the physical evidence." (State Ct. R., Ex. 14 at Dkt. 28-15). He further argued that the appellate court's decision "allowed the circuit court to resolve the disputed factual issues in favor of the state," raising again the issue of counsel stipulating to "inaccurate" forensic testimony which otherwise should have been used to impeach eyewitness testimony. (*Id.*). Finally, he reiterated his contention that the circuit court "inappropriately determine[d] that trial counsel and appellate counsel made strategic decisions" involving, among other things, stipulating to the

"faulty" forensic evidence and that the appellate court has allowed this by way of affirming the postconviction petition dismissal. (*Id.*). The Supreme Court of Illinois again denied Petitioner's PLA. (State Ct. R., Ex. 15 at Dkt. 28-16).

Petitioner subsequently filed a successive post-conviction petition (State Ct. R., Ex. 17 at Dkt. 28-18) and supplemental claims to the successive post-conviction petition (State Ct. R., Ex. 18 at Dkt. 28-19), neither of which involve issues Petitioner raises in his instant petition.

### D.     Federal Habeas Corpus Proceedings

Petitioner originally filed this petition in the Southern District of Illinois under case number 22-cv-2744-SMY (Dkt. 1), which was dismissed without prejudice to renewal after the exhaustion of state court remedies. (Dkt. 7). The petition was later transferred to this Court (Dkt. 10) and reinstated after Petitioner's motion to reconsider was granted (Dkt. 12). Petitioner raises five grounds for relief, each of which alleges trial counsel was ineffective with respect to expert witness Dr. Ralston and his stipulated testimony.

### Ground I

Petitioner first claims that his "trial counsel permitted false forensic evidence to be admitted into evidence in his trial without investigating the stipulation for its accuracy." (Pet. at 5, Dkt. 1).[3] Specifically, Petitioner contends that his counsel agreed to a stipulation from expert witness Dr. Ralston regarding the victim's gunshot wounds and the trajectory of the shots fired. (*Id.*). According to Petitioner, his trial counsel failed to properly investigate whether the information stipulated to was accurate and, if he had, he would have realized that two of the alleged gun shots were fabricated, as evidenced by the fact that they are contradicted by the Chicago Police

---

[3] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

Department's supplemental morgue report detailing Dr. Ralston's external examination and Dr. Ralston's autopsy diagram of the gunshot wounds. (*Id.* at 5-6). Petitioner maintains that trial counsel knew he was claiming self-defense, and the evidence admitted through the stipulation "bolstered" the prosecution's theory that this was not self-defense and the testimony of a prosecution witness. (*Id.* at 6).

## **Ground II**

Petitioner next claims that his trial attorney "failed to investigate the forensic evidence," specifically the CPD morgue supplemental report of Dr. Ralston's external evaluation and Dr. Ralston's autopsy diagram which both show, according to Petitioner, that the victim was shot nine times. (Pet. at 8). This allegedly resulted in the admission of "harmful false evidence into trial without object[ion]," a lack of rebuttal to the evidence by using "accurate" forensic evidence, and the "fail[ure] to use forensic evidence to impeach prosecutor's witnesses." (*Id.*). Petitioner claims that "counsel's strategic choices should have been made by information Petitioner gave him." (*Id.* at 9).

## **Ground III**

Petitioner asserts that his "trial counsel failed to interview forensic pathologist Dr. Ralston," the medical examiner in this case. (*Id.* at 10). According to Petitioner, the alleged discrepancies between the morgue report and autopsy diagram and Dr. Ralston' testimony (nine GSWs versus eleven GWSs) rendered it unreasonable for counsel not to interview Dr. Ralston and resulted in a violation of Plaintiff's rights of due process, to confront and cross-examine witnesses, and present a defense. (*Id.* at 10-11).

### Ground IV

Next, Petitioner contends that his trial counsel "failed to bring to the [fact finder's attention] that the physical evidence [detailed in the morgue report and autopsy diagram] contradicted the testimony of the state's witnesses" during trial. (*Id.* at 12). The prosecution's four eyewitnesses' testimony was contradicted, Petitioner claims, by the morgue report and autopsy diagram, and counsel did not subject the prosecution's evidence to appropriate adversarial testing or impeach the witnesses. (*Id.* at 13-14). Further, counsel's failure to point out the discrepancies to the fact finder allowed the prosecution to rely on the "fabricated" evidence during closing argument, to which counsel did not object. (*Id.*).

Petitioner admits the Illinois state courts found this ground for relief was waived because it was not raised on direct appeal, but Petitioner suggests that his trial counsel misplaced his file and thus did not receive documents until after the direct appeal was filed and asks the Court to excuse any procedural default. (*Id.* at 14-15).

### Ground V

In Petitioner's final ground for relief, he asserts that his trial counsel stipulated to Dr. Ralston's testimony without consulting him, which resulted in violation of Petitioner's right to confront and cross examine witnesses and present a defense. (*Id.* at 16). Petitioner contends that if his counsel had consulted with him regarding Dr. Ralston's stipulation, Petitioner would have recognized the errors in the evidence and would not have agreed to the stipulation. (*Id.* at 17).

### ANALYSIS

Respondent contends that the petition should be denied because Petitioner's claims are procedurally defaulted and even if they are not, they are barred by 28 U.S.C. § 2254(d). (Ans. at

11

54-65; Dkt. 27). The Court agrees that Petitioner's claims are procedurally defaulted and thus denies the petition.

Before seeking review from a federal court through a habeas corpus petition, petitioners must present their claims for state court review. "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In Illinois, a complete round of appellate review includes (1) review by the appellate court, followed by (2) seeking review by the Illinois Supreme Court by way of a petition for leave to appeal. The same process applies for a postconviction petition for relief.

In this case, Petitioner completed two full rounds of review before the Illinois courts—he sought review from the appellate court and then filed a PLA with the Illinois Supreme Court during both his direct appeal and postconviction proceedings. Because none of the claims Petitioner raised in his direct appeal are raised in the instant habeas petition, the Court need not consider the direct appeal and instead focuses solely on the post-conviction proceedings.

Put simply, while each claim raised in the instant petition was raised in Petitioner's counseled post-conviction petition, none of those claims were raised by Petitioner in his appeal of the trial court's dismissal of the post-conviction petition.[4] While Petitioner's third and fourth argument on appeal discuss the stipulation to Dr. Ralston's testimony, they do so only in the context of arguing that the circuit court erred by acting "impermissibly" and "inappropriately" rather than arguing that counsel was ineffective. And while the appellate court discusses Petitioner's contentions that trial counsel allowed the admission of faulty forensic evidence and

---

[4] The Court notes that Petitioner was represented by the same counsel when he filed his postconviction petition and subsequent appeal.

failed to use the forensic evidence to impeach witnesses, it considered the issues not because Petitioner raised them but instead "within the context of determining whether the claims in [Petitioner's post-conviction petition were] frivolous and patently without merit." *People v. Haynes*, 2021 IL App (1st) 200110-U, at ¶ 33 (Dkt. 28-2).

In fact, Petitioner admits that his claims were not raised through one compete round of state court review. In his reply brief, he acknowledges that his claims were raised only at the first level (post-conviction petition) and third level (PLA) and "agree[d] that his counsel failed to proceed claim by claim at the appellate level[.]" (Reply at 1203; Dkt. 37). Nevertheless, Petitioner argues that he "did fairly present each claim within his first claim and third claim . . . sufficiently alerting to the nature of his federal constitutional claim" and the appellate court's acknowledgement of his claim "shows that the court was clearly made aware of such claims." (*Id.*). But the law is abundantly clear that a petitioner must complete one full round of state court review before a federal court may grant relief. *See O'Sullivan*, 526 U.S. at 844; *see also Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017); *Johnson v. Foster*, 786 F.3d 501, 504 (7th Cir. 2015) ("To protect the primary role of state courts in remedying alleged constitutional errors in state criminal proceedings, federal courts will not review a habeas petition unless the prisoner has fairly presented his claims throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings.") (citations and quotations omitted).

"To avoid procedural default, a habeas petitioner must have presented fully and fairly his federal claims to the state courts before he may obtain federal review of those same claims." *Chambers v. McCaughtry*, 264 F.3d 732, 737–38 (7th Cir. 2001). "Fair presentment requires the petitioner to give the state courts a meaningful opportunity to pass upon the substance of the claims

later presented in federal court[,]" which requires that the petitioner place "both the operative facts and the controlling legal principles before the state courts." *Id.* (citations and quotations omitted). The reality is, in this case, Petitioner placed ***none*** of the operative facts or controlling legal principles before the appellate court regarding any alleged ineffective assistance of counsel—a fact he readily admits. Because Petitioner concedes that he failed to raise the claims in his petition in one complete round of state court review, they are procedurally defaulted. Accordingly, his habeas petition is denied.

### CERTIFICATE OF APPEALABILITY AND NOTICE OF APPEAL RIGHTS

A court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant makes such a "substantial showing" by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that, because of the adequacy of the issues presented, the petitioner deserves encouragement to appeal. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citations and quotations omitted). The Court concludes that Petitioner cannot make such a substantial showing and thus declines to issue a certificate of appealability.

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2).

14

A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## CONCLUSION

For all the foregoing reasons, Petitioner's habeas corpus petition [1] is denied and the Court declines to issue a certificate of appealability. The Clerk is directed to update the docket to reflect that the Respondent is McKenna Wenzel, Warden, Danville Correctional Center and alter the case caption to *Haynes v. Wenzel*. All pending motions and deadlines are terminated as moot. Civil case terminated.


**DATED**: September 8, 2025             ENTERED:

_LaShonda A. Hunt_

LaShonda A. Hunt
United States District Judge

15